UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                        :

FELICIA HAIMDAS,                  :

           Petitioner,        :       **MEMORANDUM AND ORDER**

       - against -         :       09-CV-02034 (ENV) (MDG)

JAGMOHAN HAIMDAS,          :

           Respondent.     :

------------------------------------------------------------X

**VITALIANO, D.J.**

      Petitioner Felicia Haimdas, a British citizen, petitions this Court for the return of her two

sons to England pursuant to the Hague Convention on the Civil Aspects of International Child

Abduction, art. 2, Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89, reprinted in 51 Fed.

Reg. 10,494 (Mar. 26, 1986) ("Hague Convention" or "Convention"), as implemented by the

International Child Abduction Remedies Act, 42 U.S.C. §§ 11601-11610 (2009) ("ICARA").

The boys – S.H., age 10, and A.H., age 12[1] – have been retained in the United States by their

father, respondent Jagmohan Haimdas, a Guyana-born naturalized United States citizen, without

petitioner's consent since August 26, 2008.

      The petition was filed on May 13, 2009. On February 23, 24 and 25 and March 2, 2010,

the Court conducted a bench trial. As authorized by Rule 43(a) of the Federal Rules of Civil

Procedure, petitioner, who had been unable to obtain a visa to travel to this country, testified via

a live video link from London, England. Respondent and Dr. Glen D. Skoler, a psychologist

retained by petitioner as an expert witness, testified in open court. The Court interviewed the

---

[1] To protect the childrens' identity, pursuant to Rule 5.2 of the Federal Rules of Civil Procedure, the Court will not
state their names or dates of birth and refers to them in this opinion by their initials.

children *in camera* on the record but outside the presence of the parties and their respective counsel.[2]

For the reasons set forth in this Memorandum and Order, which constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, the petition is granted.

## FINDINGS OF FACT

A. Chronology of Events

    1. *Petitioner and Respondent Marry in England and Move to America, Where the Children Are Born*

Petitioner and respondent became romantically involved in 1996, when petitioner was 18 years old and respondent was 28 years old. Petitioner's sister and respondent's brother had married in late 1994 and settled in Queens, New York, where they shared a house with the groom's family, including respondent. Near the end of 1996, after petitioner finished her "A-levels"[3] in England, she came to visit her sister in the United States for a three-month holiday. Petitioner and respondent began dating, and their first child was soon conceived. (Tr. 18:6-19:18).[4]

When petitioner returned to England, her mother learned of the pregnancy and told her father, who was not pleased. Petitioner's father spoke to respondent's mother, and together they urged petitioner and respondent to marry. Despite some misgivings on the part of petitioner, petitioner and respondent were married at a ceremony in London on December 21, 1996. (Tr. 19:21-20:22). Within two weeks of their wedding, on January 24, 1997, petitioner and

---

[2] This procedure is consistent with those adopted by district courts in Hague Convention cases. See, e.g., Matovski v. Matovski, No. 06 Civ. 4259, 2007 WL 2600862, at *1 & n.2 (S.D.N.Y. Aug. 31, 2007); Koc v. Koc, 181 F. Supp. 2d 136, 144 & n.10 (E.D.N.Y. 2001).

[3] In the British educational system, "A-levels" are post-secondary school examinations used as a qualification for entrance into university.

[4] Citations to "Tr." denote the hearing transcript.

respondent came to the United States together and moved into their extended family's house in Queens, although petitioner had only a tourist visa. (Tr. 20:23-21:7, 28:4-16).

In June 1997, the first of their two sons, A.H., was born in the United States. As the child of a citizen of the United Kingdom, A.H. became a dual citizen of both countries upon his birth, and retains that status today. (JPTO § VI at ¶¶ 7, 9).[5] In April 1998, petitioner and respondent moved out of their family's home and into a one-bedroom apartment in Queens, and approximately two years later their second son, S.H., was born. Like A.H., S.H. is a dual citizen of the United States and the United Kingdom. (Tr. 22:15-21; JPTO § VI at ¶¶ 8, 9).

2. *Petitioner Moves Back to England with the Children*

Petitioner testified that, not long after their first child was born in the summer of 1997, petitioner and respondent's marriage hit the rocks. (Tr. 23:6-24:4). The relationship deteriorated further after the arrival of their second child in the spring of 2001. In September 2001, petitioner decided, with respondent's blessing, to take the children to England by herself and raise them there indefinitely. At the time, A.H. was four years old and S.H. was approximately 17 months old. Petitioner took as many belongings as she could fit into five suitcases, and flew to England with the boys on one-way tickets purchased by respondent. Upon arrival, they moved in with petitioner's mother in Croydon, an outer borough of London. (Tr. 24:5-25:1; JPTO § VI at ¶ 10). A.H. started nursery school in England in October 2001, while S.H., still an infant, stayed home with his mother. (Tr. 25:2-25:24). They lived in England without interruption for the next seven months.

---

[5] Citations to "JPTO" denote the First Amended Joint Pre-Trial Order, Docket No. 61, § VI of which contains "a list of facts not in dispute and stipulated to by the parties."

3. *The Children Stay with Respondent in America for Three Years*

On April 12, 2002, petitioner and the children flew to New York for what petitioner intended to be a two-week visit, accompanied by petitioner's brother (the boys' uncle). They traveled on round-trip tickets, again purchased by respondent. The purpose of the visit was to see if it was possible for petitioner and respondent to reconcile and save their marriage. (Tr. 26:1-27:25). Upon landing at John F. Kennedy International Airport in Queens, petitioner was denied entry into the United States because she had previously overstayed her tourist visa by four years, and was forced to reboard a plane back to England by herself. Her children and brother, however, cleared Immigration and Customs and entered the arrivals terminal, where respondent was waiting to pick them up. (Tr. 28:4-24). A.H. was nearly five years old, and S.H. was on the verge of turning two.

Before petitioner flew back to England, she had an opportunity to speak to respondent for a few minutes at the airport, and told him "to send the children home after two weeks with [her] brother." (Tr. 29:6-14). Notwithstanding the conversation, when the time came to use the round-trip tickets he had purchased for them, respondent refused to send the children back as scheduled. (Tr. 29:23-30:17). For the next three years, over petitioner's objections and entreaties, the boys lived with respondent in New York. (Tr. 29:24-32:21).

Although he refused to allow their children to go back to England and live with petitioner during this period, respondent did not wholly block her from seeing them, with certain conditions and limitations. At Christmas 2002, respondent escorted the boys on a short trip to England, and during the summers of 2003 and 2004, the boys came to England unaccompanied by respondent for four to six-week visits. Respondent insisted that the boys sleep at the home of petitioner's father (then the father-in-law of both respondent and respondent's brother) rather than stay with

4

petitioner, but otherwise did not impede her access to them. (Tr. 31:7-25; JPTO § VI at ¶¶ 12, 13).

### 4. *The Children Stay with Petitioner in England for Three Years*

In the summer of 2005, A.H and S.H., then eight and five years old, respectively, returned to England and remained there for the next three years. During this period, they lived with petitioner in an apartment close to her mother's home in Croydon and attended British schools. Petitioner took care of the children's overall well-being, providing them with clothes, food, shelter, medical and other living expenses and overseeing their education. (Tr. 35:6-22; JPTO § VI at ¶¶ 14-17). The facts surrounding this turn of events are the subject of some dispute.

According to petitioner, during their summer 2005 visit, the boys told petitioner that they wanted to live with her and did not want to return to the United States because their father had been hitting or punishing them. (Tr. 32:17-33:1). Petitioner called respondent and proposed that the boys stay with her, and respondent agreed. Shortly thereafter, respondent flew to England and confirmed his agreement with petitioner in person. He also gave petitioner the boys' passports and birth certificates so that she could enroll them in school, and purchased their British school uniforms. (Tr. 33:2-15). Petitioner stated that respondent never said anything about if or when the children would have to return to New York. However, petitioner admitted that in some heated discussions or phone conversations, "he may have said that [she] kidnapped them." (Tr. 34:7-15).

Respondent initially testified at trial that he had not agreed that the boys could stay in England in July 2005, and that petitioner had never asked him to consent to that. (Tr. 103:10-104:7). He then testified that petitioner had asked him if she could keep the younger child for a

5

period of two years so that she could form a stronger "bond" with him. (Tr. 104:22-105:10). At that point, petitioner's counsel confronted respondent with a portion of his deposition transcript reflecting that respondent had previously testified that petitioner asked him if she could keep S.H. with her in England for a year and a half.[6] (PTX 9 at 100-106).[7] His recollection apparently refreshed, respondent stated that the time frame petitioner had requested was in fact a year and a half, rather than two years. (Tr. 105:11-107:5).

Even crediting respondent's vague and inconsistent testimony that, in July 2005, he only gave his permission for the children to live in England for a finite period not to exceed two years, he plainly had a change of heart before the agreement ran its course. Respondent traveled to England in April 2006, around the time of S.H.'s birthday. When he arrived, petitioner and the boys were out of the country, spending Easter vacation in Barbados. According to petitioner, respondent did not tell her beforehand that he was coming, and she only found out when her parents called her in Barbados to warn her. (Tr. 44:22-45:10). Respondent testified that he went to England to celebrate S.H.'s birthday and to see both children because he missed them, and that petitioner did know he was coming. (Tr. 102:21-24, 112:18-113:22).

According to petitioner, upon returning to England, she spoke to respondent (who was staying at her father's house) on the phone, and respondent threatened to "kidnap" the children. (Tr. 45:17-22). Petitioner, who had recently begun the process of divorcing respondent, contacted her matrimonial lawyer, who suggested that she go to her local court and apply for a "prohibited steps order." Petitioner understood this to be an order for respondent "not to be able to take the children outside the UK." (Tr. 46:1-10). She followed counsel's advice and successfully applied for an *ex parte* order from the Croydon County Court on April 12, 2006,

---

[6] The Court notes that the deposition transcript was not executed, and respondent stated that his counsel had never reviewed it with him. (Tr. 105:11-106:6).

[7] Citations to "PTX" denote petitioner's trial exhibits.

6

captioned "Interim Prohibited Steps Order, Section 8 Children Act 1989" ("Prohibited Steps Order"). It provided, in relevant part:

> Upon hearing the Applicant in Person and Upon the Respondent having no notice of the hearing
>
> 1. Until further order the applicant and respondent are prohibited from removing the children from England and Wales.
>
> 2. Until further order the respondent is prohibited from removing the children from the care of the applicant or from the care of any person to whom she has entrusted such care, save for the purposes of agreed contact.
>
> 3. The respondent do return the children to the applicant promptly at the expiry of any agreed contact.
>
> 4. Permission to applicant to withhold her address.

(PTX 25). The proceeding was adjourned for one week, to April 19, 2006, and the time for service of the order was abridged to 24 hours. (Id.).

Respondent received the Prohibited Steps Order in the mail at petitioner's father's home, where he was staying while in England. (Tr. 102:17-24). Respondent testified at trial that he never actually read the Prohibited Steps Order and was unaware of its contents. (Tr. 131:13-24). Notwithstanding, both petitioner and respondent duly appeared before the Croydon County Court on the return date. (Tr. 102:17-24). Petitioner was represented by counsel from the firm of Blackfoot & Co., while respondent appeared *pro se*.[8] According to petitioner, the judge heard from her counsel regarding respondent's alleged "previous history of violence towards both [petitioner] and the children," and "agreed that the children should stay with [petitioner]." (Tr. 94:1-3). Respondent expressed his belief that the children belonged back in the United States

---

[8] Petitioner testified that she was under the impression that respondent had consulted with counsel at Steven Drake Solicitors regarding the Prohibited Steps Order prior to the hearing, as the latter firm had contacted petitioner's counsel on respondent's behalf. However, petitioner definitively stated that respondent was not represented by counsel in their divorce proceedings, which were pending in the Croydon County Court at the same time. (Tr. 50:21-51:24). Respondent's testimony on this point is diametrically opposed; he acknowledged that at some point in time he did speak with a lawyer in England but, according to his recollection, that conversation pertained to the divorce and took place prior to the issuance of the Prohibited Steps Order. (Tr. 137:8-23). In any event, no counsel ever formally appeared on respondent's behalf in either the divorce case or the hearing on the Prohibited Steps Order. (Tr. 71:2-4).

because it was their country of birth, and was informed by the judge that the purpose of the proceeding was to work out terms for him to see the children in the near future, not to decide where or with whom they should live in the long run. (Tr. 114:6-13, 116:3-8). Respondent then asked the judge to permit him to spend time with the children before he left England, and also asked that they be provided with a telephone so that he could maintain indirect contact with them from the United States. (Tr. 48:25-49:3, 113:10-25, 116:23-117:6). He did not seek permission for the children to visit him in the United States or inform the judge that he wanted to bring them back to live with him on a permanent basis. (Tr. 116:13-18, 117:7-11).

At the conclusion of the April 19, 2006 hearing, the judge issued an order titled "Contact Order, Section 8 Children Act 1989" ("Contact Order"), providing in relevant part:

1. Paragraphs 1, 2 and 3 of the [Prohibited Steps Order] do continue.

By Consent

2. The mother do make the children available for contact to the father at the children's maternal grandmother[']s home between 6:30pm and 8:30pm on the 19th April 2006 and 20th April 2006.

3. There be indirect contact by card and/or letter addressed to the children at their maternal grandmother[']s address limited to one per fortnight.

4. Upon the father providing a mobile phone to the children there be indirect contact by telephone. The father to telephone the children at 1pm (British Time) on Saturdays.

5. There be such other contact as may be agreed by the parties including, contact around [A.H.'s] birthday.

(PTX 26). The Prohibited Steps Order and the Contact Order were printed on the same standardized form, which included a bold-faced warning at the foot of the first page stating: "It may be a criminal offence under the Child Abduction Act 1984 to remove the children from the United Kingdom without the leave of the court." Additionally, the form included a warning regarding certain restrictions on removal of children from the United Kingdom that apply "[w]here a residence Order is in force." (PTX 25, 26). However, as discussed further below,

prohibited steps, contact and residence orders are three distinct and discretely defined types of orders which may be issued by an English court pursuant to the Children Act, see n.14, infra, and the record contains no evidence or allegation that a residence order has ever been issued with respect to the children in this case.

On April 19 and 20, 2006, respondent visited with the children as authorized by the Contact Order. He returned to the United States without further incident shortly thereafter. Approximately two months later, petitioner and respondent's divorce was finalized. (PTX 37).

The children next saw respondent in August 2006, when, with petitioner's consent, they flew to New York on round-trip tickets purchased by respondent, stayed with him for about a month, and then arrived back in London as scheduled. (Tr. 52:23-53:8). A few months later, petitioner permitted them to return to New York for a two-week visit over Christmas, for which respondent also purchased round-trip tickets. This time, respondent unilaterally decided to extend the boys' trip for a few days and pushed back their return flight reservations without consulting petitioner, but after that brief delay, he put them on a plane back to England once again. (Tr. 53:9-54:4). The following Christmas, petitioner consented to another two-week visit, which ended on time. (Tr. 54:8-19).

5. *The Children Again Stay with Respondent in America, Where They Currently Remain*

On July 25, 2008, with petitioner's consent, the boys again flew to New York to see respondent. They came on round-trip tickets. As usual, respondent had purchased them. The return flight was scheduled to depart New York on August 25, 2008, and land in London the following morning. (PTX 57). According to petitioner, on or around August 20, 2008, respondent called petitioner and informed her that the boys would not be returning to England because "it was his turn to have them," then hung up when petitioner protested. (Tr. 56:17-

57:17, 62:2-5). A few hours later, the children spoke to petitioner on respondent's cell phone and told her that they wanted to stay in the United States and were unwilling to return to England; in petitioner's opinion, "[y]ou could tell in their voices that they were prompted in what to say." (Tr. 57:25-58:9). Respondent testified that the boys had resisted going back to England and had asked respondent to allow them to stay and live with him instead, and that respondent initially told them to ask their mother for her permission and then called her himself. Respondent further testified that he contacted petitioner because he believed it was the right thing to do under the circumstances, not because he thought he had a legal obligation to obtain petitioner's consent to retain the children in the United States. (Tr. 124:11-125:24).

After respondent told her that he intended to keep the boys in the United States, petitioner promptly consulted her matrimonial counsel, who advised her to sit tight until they actually failed to return as scheduled. Petitioner testified that, on August 25, 2008, she spoke to the children on the telephone and they told her that they were packed, showered and waiting to be taken to the airport for their flight back to London. Later that day, however, petitioner called back and learned that the children were still in New York. (Tr. 59:12-25). Once petitioner could be certain that the children had indeed missed their return flight, she called her attorney again, who advised her to commence legal action against respondent pursuant to the Hague Convention. (Tr. 59:2-4, 62:10-13).

Petitioner was unable to reach respondent by telephone for several days after August 25, 2008. When she finally spoke to him, he declined to send the children back once again, and told petitioner: "[Y]ou can see them when I say you're going to see them now. It's going to be on my terms and my terms only." (Tr. 60:1-12). When petitioner reminded respondent that the Contact Order remained in force, "he said, I don't care." (Tr. 60:13-17). In fall 2008, S.H. and A.H.

started school in the United States. (Tr. 130:12-17). On October 3, 2008, petitioner filed an application for return of the children with the Hague Convention's Central Authority for England and Wales, and on May 13, 2009, petitioner commenced the instant case by filing the Verified Petition with this Court.

Since July 2008, when A.H. and S.H. were, respectively, 11 and eight years old, petitioner has not seen either child in person and has had only limited contact with them by email and phone. At the time of trial, the children had been living in the United States with respondent for approximately 17 months.

B. Interview of the Children

The Court interviewed A.H. and S.H. separately *in camera* . A.H., then in seventh grade and a few months shy of his 13th birthday, is clearly a thoughtful, intelligent, articulate, polite and good-natured child. At the beginning of the interview, A.H. indicated that he understood the importance of telling the the the whole truth, and told the Court that he would do so. The Court finds that his statements were credible and that he made an effort to respond to questions openly and honestly. That said, A.H. frequently struggled to recall specific details about the past, and seemed hesitant or uncertain about many answers.

A.H. echoed respondent's testimony that he and his younger brother had lived in England after 2005 so that they (and his brother in particular) could "bond" with petitioner, and that the plan was not for them to remain there permanently. However, he also acknowledged that the stay in England was not a vacation and was intended to go on for more than a short period of time, although he could not say what the intended length was. (Tr. 363:21-364:12). On the whole, A.H. had generally good memories of attending school in England, although he remembered having more homework and finding school to be more demanding there. He

indicated that he made many friends in England with whom he would have liked to stay in touch, but currently has no way to reach.

As might be expected given his physical separation from his mother, A.H. is currently distanced from her in an emotional sense as well. He had trouble recalling the last time he saw her, although it was less than two years before, and remarked somewhat offhandedly that he "never really had a close relationship with [his] mother." (Tr. 346:17-347:5, 358:7-8). He also professed not to know how she feels about the fact that he and his brother have stayed in New York with respondent since the summer of 2008, although he perceives that this proceeding is related to the fact that his mother "is fighting for custody or something like that, for us to go back to England." (Tr. 320:6-7, 351:24-352:2, 364:21-365:2).

A.H. maintained that he does not want to return to England, and prefers to live in the United States. When the Court initially asked A.H. to explain why, he offered several disjointed reasons in rapid succession, some rational and some less so: (1) his mother sometimes hits him and his brother[9]; (2) it rains too much in England; (3) he loves both of his parents, but loves his father more; and (4) he has more family members in America than he does in England. (Tr. 352:13-23). Throughout the interview, A.H. also mentioned that: (5) his mother occasionally drinks alcohol to excess (Tr. 344:10-22); (6) he feels that his mother pushes him too much academically (Tr. 353:1-5); (7) his grandfather (respondent's father, who currently resides with respondent and the children in Queens) permits him to drink soda and eat candy and his mother does not (Tr. 353:5-8); (8) he enjoys playing cricket, baseball and basketball in the United States, but there is no baseball or basketball in England and he does not get to play cricket there as often as he does here (Tr. 355:3-356:1); and (9) he has vague or second-hand memories of occasions

_____

[9] A.H. talked about a specific occasion on which his mother had gotten angry and hit him and his brother, and told the Court that his mother had spanked his brother with a shoe or slipper definitely more than once, and probably more than five times. (Tr. 336:-22-337:25).

on which his mother left him and/or his brother alone. (Tr. 362:5-9 ("I heard she left [S.H.] in the car by himself and for almost two hours . . . . I think she left me in the house with [S.H.] for an hour one time to get some stuff from my grandma's house. I think one time I got locked out the house.")).

Ultimately, however, A.H. explained that his paramount reason for objecting to return was none of the above; rather, it was his desire not to be separated from his little brother. A.H. acknowledged that he did not start thinking in earnest about asking to stay in New York until after he and S.H. arrived here in July 2008. According to A.H., at some point during the visit, the boys talked about where they would rather live and "[S.H. said] I want to stay over here in New York. I don't want to be split from my brother. I said that's what I think too. That is what I thought too." (Tr. 354:2-5). A.H. readily acknowledged that staying together with his brother is his most important concern, no matter where they end up. Aside from that, A.H. actually indicated that he would prefer not to shoulder the burden of making a choice about where to live: "I don't put too much thought into it. I thought like, okay, it's something big, but it's not really my business now until it comes to me, if it ever comes to me." (Tr. 357:25-358:1).

Next came the interview of S.H., in fourth grade and nine and a half years old at the time of the hearing, who was as bright and generally delightful as his older brother. S.H. said that he enjoys attending school in the United States, has made friends here and, in particular, was excited about working on a project for an upcoming science fair. The Court established at the outset of the interview that S.H. understood the difference between telling the truth and not telling the truth and thereafter ascertained his credible promise to respond to the Court's questions truthfully and completely. S.H. also stated that he had not been told what to say by

respondent or anyone else, and the Court found (as with A.H.) no indication that S.H. had been directly coached by any adult about what to say.

Commensurate with his younger age, S.H.'s stream of statememts was more jumbled than A.H.'s, and he made more fanciful and unrealistic comments. For example, in contrast with his brother's assessment, S.H. stated that he "had more education" in New York. When asked to elaborate, he stated that the only two subjects taught in school in England are writing and math, and that there are no science, social studies or gym classes there. (Tr. 374:6-22).

Like his brother, S.H. described the children's move to England in 2005 as " a deal" made by their parents "because [their] mom wanted to get more bonding time with" him, and believed that they were expected to live in the United States again someday but did not know when. (Tr. 375:18-22, 381:14-15). He also had only hazy recollections of last seeing petitioner, and had trouble remembering whether and when he had spoken to her since arriving in New York in summer 2008. (Tr. 390:22-392:16). Nonetheless, S.H. painted an even more Dickensian portrait of what, in his memory, life was like with his mother in England. S.H. flatly stated in sweeping terms that his mother "used to hit me with a belt . . . . [t]he metal part, and with slippers. She used to leave us in cars. She left me in the car for six hours." (Tr. 381:17-382:6).

Again like his brother, S.H. indicated that he expected to return to England when he came to New York in summer 2008, but decided after arriving that he wanted to continue living here rather than move back to England, for a similar panoply of stated reasons. He confirmed that he and A.H. had talked about where they wanted to live and described the decision as a joint one: "We made it like when it was summer, like we enjoyed the time there. We said we wanted to stay with dad in New York . . . that's when we made our decision." (Tr. 388:5-8). Unlike A.H.,

however, S.H. insisted that his objection to return was not contingent on his brother's concurrence, and that he would want to stay here even if A.H. were to return to England. (Tr. 394:11-22). He also openly professed to be on his father's "side" in this case, without the ambivalence that A.H. had displayed, explaining: "He treats us more better than our mom did. He buys us like things we want, but we don't waste his money. Our mom, she didn't really buy us anything." (Tr. 395:7-13). When pressed, S.H. acknowledged that money is not always the most important thing, but added: "He took care of us. My mom used to leave us home by ourselves." (Tr. 395:14-16).

C. Expert Testimony

At the hearing, Dr. Skoler was qualified as an expert in clinical and forensic psychology and his report, dated October 5, 2009, was received into evidence without objection.[10] (PTX 11). Dr. Skoler testified that he had conducted "extensive clinical evaluations and interviews over two days . . . with both of the children together and individually," interviewed petitioner at length via telephone on several occasions, met briefly with respondent in person and reviewed both parties' filings in this case. (Tr. 183:5-184:10). In his report and at trial, Dr. Skoler opined that neither A.H. nor S.H. has attained a sufficient age and degree of maturity to be capable of forming a reasonable and rational opinion about whether to return to England or stay in the United States. He based this conclusion on the following factors: (1) statements by each child indicative of "the cognitive limitations of preadolescence" (Tr. 187:23-25); (2) the influence of "parental alienation dynamics" (Tr. 188:17-19); (3) his perception that "the children had a great deal of difficulty both on [psychological] testing and in interview talking about some of their real feelings" (Tr. 188:17-19); (4) their chronological ages in August 2008, when they were retained in the United States by respondent (Tr. 189:13-25); and (5) the fact that they had previously experienced "two

---

[10] But see n.17, infra.

sudden and sustained separations from their mother," resulting in conscious or unconscious feelings of anger and rejection. (Tr. 190:5-11).

As reflected in his report and its exhibits, Dr. Skoler administered several standardized psychological tests to both A.H. and S.H.: the Millon Pre-Adolescent Clinical Inventory ("M-PACI"); the Children's Depression Inventory ("CDI"); the Personality Inventory for Youth ("PIY"); and the Wechsler Abbreviated Scale of Intelligence ("WASI"). The only one of these tests that Dr. Skoler deemed to have yielded valid results, however, was the WASI, from which he concluded that the IQs of both boys fall into the "above average" range. (PTX 11 at 23). He found their M-PACI scores to be "of questionable validity" because their answers seemed "overly guarded" about their true feelings. (Id. at 18-20). Similarly, Dr. Skoler stated in his report that "[b]oth of the children did not appear to be forthrightly reporting the extent of their feelings on the CDI" (id. at 18), and that their PIY answers were invalid because of their "defensiveness." (Id. at 21). Dr. Skoler also administered selected portions of the Roberts Apperception Test for Children ("RATC") to S.H., based on which Dr. Skoler opined that S.H.'s "unconscious feelings about his mother[ ] were sad and poignant, compared to his guardedness" on the M-PACI, CDI and PIY. (Id. at 22). Dr. Skoler stated that he "chose not to give the" RATC to the older child at all, "since he was so clearly somehow psychologically warned about this evaluation, and would likely have seen through the purpose of the test." (Id.).

## CONCLUSIONS OF LAW

A. Hague Convention Overview

The Hague Convention "was adopted in 1980 in response to the problem of international child abductions during domestic disputes." Abbott v. Abbott, -- S. Ct. --, No. 08-645, 2010 WL 1946730, at *5 (May 17, 2010). The Convention's express objectives are "to secure the prompt

return of children wrongfully removed to or retained in any Contracting State," and "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." Hague Convention, art. 1. Since its inception, the treaty has been ratified by over 80 nations, including, most pertinently, the Unites States and the United Kingdom.

The Convention is especially designed to deter "those close to [a child], such as parents, guardians, or family members," from unilaterally taking or keeping the child out of the country of habitual residence with an intent "to establish artificial jurisdictional links" to a more sympathetic forum for a custody dispute. Gitter v. Gitter, 396 F.3d 124, 129-30 (2d Cir. 2005) (internal quotation marks omitted). Accordingly, "[t]he Convention's central operating feature is the return remedy. When a child under the age of 16 has been wrongfully removed or retained, the country to which the child has been brought must 'order the return of the child forthwith,' unless certain exceptions apply." Abbott, 2010 WL 1946730, at *5 (quoting Hague Convention, art. 12). "[A] 'wrongful removal' under the Convention is one 'in breach of rights of custody . . . under the law of the State in which the child was habitually resident.'" Blondin v. DuBois, 238 F.3d 153, 157 (2d Cir. 2001) ("Blondin II") (quoting Hague Convention, art. 3) (ellipsis in Blondin II). The Convention defines "rights of custody" to "include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Hague Convention, art 5.

Pursuant to ICARA, the Convention's implementing legislation in the United States, an aggrieved custody claimant may file a petition in state or federal district court for the return of a child located within the court's jurisdiction. The petitioner bears the initial burden to show by a preponderance of the evidence that the child has been wrongfully removed to or retained in this

country within the meaning of the Convention. See 42 U.S.C. § 11603(b), (e)(1)(A). If the petitioner successfully makes out a *prima facie* case of wrongful removal or retention, the burden shifts to the respondent to establish one of the Convention's narrow defenses, and if the respondent fails to do so the child must be returned. See Blondin v. DuBois, 189 F.3d 240, 245 (2d Cir. 1999) ("Blondin I"). Further, even where a defense is found to be applicable, the court need not allow the child to remain with the "abducting" parent if it appears that return would further the aims of the Convention. See Friedrich v. Friedrich, 78 F.3d 1060, 1067 (6th Cir. 1996) (construed in Blondin I, 189 F.3d at 246 n.4).

"The Convention and [ICARA] empower courts in the United States to determine only rights under the Convention and not the merits of any underlying child custody claims." 42 U.S.C. § 11601(b)(4). Consequently, a court considering a Hague Convention petition has jurisdiction only over the wrongful removal or retention claim, and "must resist the temptation to engage in a custody determination under the traditional 'best interests' test." Elyashiv v. Elyashiv, 353 F. Supp. 2d 394, 403 (E.D.N.Y. 2005); see Hazbun Escaf v. Rodriquez, 200 F. Supp. 2d 603, 610-11 (E.D. Va. 2002) ("[T]he focus of a court's inquiry in a Hague Convention case is not 'the best interests of the child,' as it typically is in a state custody case; rather it is the specific claims and defenses under the Convention."). "A return remedy does not alter the pre-abduction allocation of custody rights but leaves custodial decisions to the courts of the country of habitual residence." Abbott, 2010 WL 1946730, at *5.

B. *Prima Facie* Case of Wrongful Retention

"[I]n order to prevail on a claim under the Hague Convention, a petitioner must show that (1) the child was habitually resident in one State and has been removed to or retained in a different State; (2) the removal or retention was in breach of the petitioner's custody rights under

18

the law of the State of habitual residence; and (3) the petitioner was exercising those rights at the time of the removal or retention." Gitter, 396 F.3d at 130-31. "The petitioner must establish these requirements by a preponderance of the evidence." Id. at 131 (citing 42 U.S.C. § 11603(e)(1)(A)).

### 1. Habitual Residence

The Hague Convention's protection against child abduction may be invoked only when the subject child has been taken or kept out of "the State in which the child was habitually resident immediately before the removal or retention." Hague Convention, art. 3(a). Yet, despite the integrality of the term, there is no definition of "habitually resident" provided in the Convention itself. See Gitter, 396 F.3d at 131; Elisa Pérez-Vera, Explanatory Report on the 1980 Hague Child Abduction Convention, Acts and Documents of the 14th Session, vol. III 441, ¶ 53 (1982) ("Pérez-Vera Report") ("Following a long-established tradition of the Hague Conference, the Convention avoided defining its terms.").[11] In 2005, the Second Circuit established a two-part test for ascertaining a child's "habitual residence" pursuant to the Hague Convention. See Gitter, 396 F.3d at 132-34.

"First, the court should inquire into the shared intent of those entitled to fix the child's residence (usually the parents) at the latest time that their intent was shared." Id. at 134. "This question can in turn be broken down into two components: whether the parents formed a shared, settled intention to abandon the child's previous habitual residence, and whether the parents have mutually intended that the child acquire a new habitual residence in a new location." Poliero v. Centenaro, No. 09-3845-cv, 2010 WL 1573771, at *1 (2d Cir. Apr. 21, 2010) (internal quotation

---

[11] The Pérez-Vera Report has been recognized by the Second Circuit as "an authoritative source for interpreting the Convention's provisions." See Gitter, 396 F.3d at 130 n.4 (internal quotation marks omitted). Additionally, the Pérez-Vera Report was recently cited by the Supreme Court as authority supporting its interpretation of the Convention, although the Supreme Court declined to decide "whether this Report should be given greater weight than a scholarly commentary." Abbott, 2010 WL 1946730, at *10.

marks omitted) (citing Gitter, 396 F.3d at 132-33; Barzilay v. Barzilay, 600 F.3d 912, 918 (8th Cir. 2010) ("The settled purpose of a family's move to a new country is a central element of the habitual residence inquiry . . . . [T]he family must have a sufficient degree of continuity to be properly described as settled.") (internal quotation marks omitted)). Shared intent must be manifested by "actions as well as declarations." Gitter, 396 F.3d at 134. Thus, if the last shared intent of the parents was to abandon a child's habitual residence, the mutually intended move must actually have taken place. See id. at 133 ("[A] change in geography is a necessary condition to a child acquiring a new habitual residence."); accord Ruiz v. Tenorio, 392 F.3d 1247, 1253 (11th Cir. 2004) ("Although the settled intention of the parents is a crucial factor, it cannot alone transform the habitual residence. In addition, there must be an actual change in geography and the passage of a sufficient length of time for the child to have become acclimatized.").

While "[n]ormally the shared intent of the parents should control the habitual residence of the child," the second step of the Gitter inquiry requires a court also to consider "whether the evidence unequivocally points to the conclusion that the child has acclimatized to the new location and thus has acquired a new habitual residence, notwithstanding any conflict with the parents' latest shared intent." Gitter, 396 F.3d at 134; see Villegas Duran v. Arribada Beaumont, 534 F.3d 142, 147 (2d Cir. 2008). The exception does not swallow the rule; in keeping with the Convention's goal of discouraging "parents and guardians from engaging in gamesmanship with a child's upbringing," Gitter, 396 F.3d at 134, the Second Circuit has warned that a court "should be slow to infer that the child's acclimatization trumps the parents' shared intent," id. (internal quotation marks omitted), and that "[t]his is a difficult test to satisfy." Poliero, 2010 WL 1573771, at *2. The presumption favoring the habitual residence last intended by both parents

may only be overcome in those "relatively rare circumstances" where it appears "possible that the child's acclimatization to the location abroad [is] so complete that serious harm to the child can be expected to result from compelling his return to the family's intended residence." Gitter, 396 F.3d at 134.

In this case, petitioner contends that the subject children are habitual residents of England, while respondent has asserted that the "[t]he children were habitually resident in New York since their birth." (JPTO § III.B. at ¶ 1). In light of the Second Circuit's guidance and the facts of this case, the Court finds that England is the habitual residence of S.H. and A.H for the purposes of the governing provisions of the Hague Convention.

During the period between January 1997 and September 2001, petitioner and respondent lived together as husband and wife in New York, and petitioner bore their two sons here. Though born on American soil, both children were at birth, and still are today, dual citizens of England and the United States. Petitioner testified undisputedly at trial that, in September 2001, she gathered essentially all of her worldly possessions and moved to England with both children in tow, intending to raise them there indefinitely as a single parent. Petitioner further testified that: (1) she decided to move after respondent kicked her and the children out of their home in Queens; (2) respondent bought one-way tickets to London for the three of them; (3) in fall 2001, petitioner enrolled the school-age older child in nursery school in England; and (4) petitioner lived with both children in England for the next seven months. These uncontroverted facts illustrate that, in September 2001, petitioner and respondent mutually intended both children to abandon life in the United States and acquire a new habitual residence in England, the agreed-upon geographical change actually occurred and the children subsequently stayed in England long enough to become acclimatized. See generally Peter R. Beaumont & Peter E. McEleavy,

The Hague Convention on International Child Abduction 112 (P.B. Carter QC ed., Oxford University Press 1999) ("[I]n the case of children, six months should be treated as a guideline figure when considering the length of time necessary before residence might be classified as habitual."). Thus, the Court finds that A.H. and S.H. were habitual residents of England as of April 12, 2002, when petitioner flew to the United States with both children for a short visit and, in a peculiarly unpleasant incident, was separated from them against her will by border officials at the airport and forced to fly back to England alone.

Respondent received the children at the airport in New York that day and refused to consent to their return to petitioner's care in England for the following three years. During this time, the Court finds no credible support for the conclusion that petitioner and respondent agreed that the boys' habitual residence should revert to the United States; rather, petitioner periodically reminded respondent that she believed it best for the children to live with her in England. Further, the Court finds no evidence in the record "unequivocally point[ing] to the conclusion" that either child became so utterly acclimatized to the United States between 2002 and 2005 that his habitual residence shifted regardless of the lack of parental consensus. Gitter, 396 F.3d at 134. Quite to the contrary, by all accounts, both boys subsequently proved capable of readjusting to life overseas with petitioner without serious incident. Accordingly, throughout this prolonged stay in the United States, A.H. and S.H. remained "habitual residents" of England for Hague Convention purposes.

Even assuming *arguendo* that the children's habitual residence did shift back to the United States after April 2002, any such change was mooted by subsequent events. In July 2005, while the boys were staying in England during summer vacation, petitioner and respondent spoke on the telephone and once again mutually decided that the boys would remain and live in

England with petitioner for the foreseeable future. Respondent testified, and petitioner did not dispute, that he agreed that the children could stay in England after petitioner expressed to him that she felt a lack of connection with the younger son and wished to reestablish their mother-child "bond." Soon after the phone call, respondent took actions to confirm their consensus: he flew to England, provided petitioner with the boys' passports so that she could enroll them in school there, purchased their new school uniforms and flew back to New York without making any effort to take the children with him. In fall 2005, both boys entered school in England and attended classes there continuously until respondent's retention of them in the United States in August 2008 prevented it. On these facts, the Court finds that, as a result of their parents' shared intent, the children returned to England – the place of their "habitual residence" – for a second time in the summer of 2005, and lived their lives there with a high degree of settled purpose for the next three years. In other words, even if their habitual residence had reverted to the United States earlier, it shifted back to England then. [12]

Even though the children are now living in the United States with respondent, and have been since late summer 2008, respondent unreservedly acknowledges that petitioner never consented or acquiesced to this arrangement. (JPTO § VI at ¶ 18). Further, there is again no evidence that, since leaving England in July 2008, either child has become so acclimatized to the United States that compelling return to England "can be expected" to result in "serious harm to the child," Gitter, 396 F.3d at 134, or would "be tantamount to taking the child out of the family

---

[12] Petitioner testified that the move to England in 2005 was agreed to be of indefinite duration, while respondent testified that the boys were supposed to return to the United States for good after a year and a half or two years. The boys seem to have absorbed a generalized understanding – though perhaps only in hindsight – that their 2005 relocation to England was slated to end after a discrete period of time, but they are hazy on the details, and also say that it was not a vacation. The Court need not decide which version of the story to credit. Whether or not the parents mutually intended in 2005 for their children to reside in England forever, the parents undisputedly agreed that the children should live in that country long enough, and with a sufficient degree of continuity, to become accustomed to their mother in the role of primary caretaker and to settle in comfortably at school. See Barzilay, 600 F.3d at 918 (noting that to establish a new habitual residence, a family's "settled purpose need not be to stay [there] forever, but [with] a sufficient degree of continuity to be properly described as settled").

and social environment in which [his] life has developed." <u>Daunis v. Daunis</u>, 222 F. Appx. 32, 34 (2d Cir. 2007) (internal citations omitted).  While the children appear to be comfortable and stable in New York and have been enjoying attending school and living with their father and other family members here for nearly two years, the boys are also well-acquainted with grandparents, cousins and other extended family members who live in England.  They have, of course, also attended school for significant stretches in that country.  Based on the *in camera* interviews of the boys, it is readily apparent to the Court that, having periodically ricocheted between America and England throughout their lives, they are eminently capable of adjusting (and readjusting) to life on either side of the pond.  Ultimately, the Court cannot conclude that, at present, their acclimatization to the United States is sufficient to outweigh their parents' last shared intent.  <u>See, e.g.</u>, <u>Poliero v. Centenaro</u>, No. 09-cv-2682, 2009 WL 2947193, at *21 (E.D.N.Y. Sept. 11, 2009), <u>aff'd</u>, No. 09-3845-cv, 2010 WL 1573771 (2d Cir. Apr. 21, 2010) (finding that "while the children have adjusted well to their new lives in New York and have been successful in pursuing their school work and other activities, the Court is hard pressed to find that they are so acclimatized that [ ] their adjustment trumps the parents' shared intent"); <u>Lachhman v. Lachhman</u>, No. 08-cv-04363, 2008 WL 5054198 (E.D.N.Y. Nov. 21, 2008), at *6 (finding that there is no evidence "unequivocally point[ing] to the conclusion that the child has acclimatized to her new location in the United States, notwithstanding her parents' intentions.  At most, the child has spent the better part of two years in the United States since her removal from the United Kingdom"); <u>Aguirre v. Calle</u>, No. 08-cv-2613, 2008 WL 4461931 (E.D.N.Y. Oct. 3, 2008), at *4 (finding no evidence that child had acclimatized to the United States despite her presence here for more than one year).

In sum, the Court finds that the most recent point in time where petitioner and respondent mutually agreed upon their children's habitual residence was in the summer of 2005, when they both agreed to reaffirm England as that geographic location. That decision was totally in harmony with the prior formed and executed shared intent in September 2001, when the marriage fell apart and petitioner and the children moved to England with respondent's cooperation. Alternatively, if a new habitual residence intervened after September 2001, shared parental intent and physical change in geographic location reverted the boys' habitual residence to the United Kingdom in the summer of 2005. Either way, the extant parental consensus was for A.H. and S.H. to be habitual residents of England, and the children's lives now are not so deeply entrenched in the United States as to warrant disregarding the locus of their Hague Convention habitual residence. Accordingly, petitioner has met her burden of showing that S.H. and A.H. were habitual residents of England immediately before respondent's retention of them in the Eastern District of New York in 2008.

*2. Retention in Breach of Custody Rights*

The Court next considers whether respondent's August 2008 retention of the children in the United States breached petitioner's "rights of custody" under English law, i.e., her "rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Hague Convention, arts. 3, 5; see Gitter, 396 F.3d at 130-31. Under the express terms of the Convention, "rights of custody" may arise from on any one or more of the following: "operation of law"; "a judicial or administrative decision"; or "an agreement having legal effect under the law of" the child's habitual residence. Hague Convention, art. 3. To this end, the Convention permits a court to "take notice directly of the law of . . . the State of the

habitual residence of the child, without recourse to the specific procedures for the proof of that law." Id., art. 14.

Petitioner asserts that she has "rights of custody" by "operation of" English law – specifically, the United Kingdom Children Act of 1989 (the "Children Act"), the statute which establishes "all the law relating to the care and upbringing of children" in that country. N.V. Lowe, The Allocation of Parental Rights and Responsibilities – the Position in England and Wales, 39 Fam. L. Q. 267, 267 (2005) (internal quotation marks omitted). Although the Children Act does not employ the word "custody" as a legal term of art,[13] it provides in relevant part that: "[w]here a child's father and mother were married to each other at the time of his birth, they shall each have parental responsibility for the child," which is defined as "all the rights, duties, powers, responsibilities and authority which by law a parent of a child has in relation to the child and his property." Children Act §§ 2(1), 3(1) (emphasis added). "More than one person may have parental responsibility for the same child at the same time." Id. § 2(5). "A plain reading of the definition[ ] of 'parental responsibility' [in the Children Act] and [the definition of] 'rights of custody' [in the Hague Convention] leads to the conclusion that the former includes the latter." Lachhman, 2008 WL 5054198, at *6. Accordingly, American courts have interpreted Section 2 of the Children Act as sufficient proof of *de jure* rights of custody for a Hague Convention *prima facie* showing of wrongful retention or removal, at least where no English court order negating the petitioner's parental responsibility is in effect.[14] See, e.g., id.;

---

[13] The Children Act, which came into force in 1991, "fundamentally reformed" English child law. Lowe, The Allocation of Parental Rights and Responsibilities, supra, at 267. One of the most significant effects of the Children Act, and the most pertinent for present purposes, "was to replace the concept of parental rights and duties with the concept of parental responsibility and to replace custody and access orders with residence and contact orders respectively . . . [T]he consequence of these reforms in English law has been to abandon notions such as 'rights of custody' and [ ], therefore, it is no longer correct to refer to them in [English] custody disputes." Id. at 268.

[14] "Divorce . . . has no effect upon the allocation of parental responsibility [under the Children Act] . . . . [T]he exercise of parental responsibility will only become an issue if a specific application for a [Children Act] section 8 order is made to the court." Lowe, The Allocation of Parental Rights and Responsibilities, supra, at 262. Section 8

Morgan v. Morgan, 289 F. Supp. 2d 1067, 1069 (N.D. Iowa 2003); In re Robinson, 983 F. Supp. 1339, 1342 (D. Colo. 1997).

Quite the opposite obtains here. In this case, English court orders were issued to protect petitioner's ability to exercise her rights to "care" for the children. The Prohibited Steps Order prohibited respondent from "removing the children from the care of [petitioner] or from the care of any person to whom she has entrusted such care" without her consent, and required respondent to "return the children to the [petitioner] promptly at the expiry of any agreed contact" (PTX 25); the succeeding Contact Order specifically provided for the continuation of these provisions. (PTX 26). Respondent's sustained refusal to return his sons to petitioner's care following August 25, 2008, the scheduled end date of the short visit for which petitioner had agreed to release them, plainly violates these specific judicial directives. Indeed, petitioner testified without contradiction that she has reminded respondent that the Contact Order is in effect, and he has told her that he simply does not care. More broadly, respondent's unilateral retention is at odds with the Children Act's conferral of "parental responsibility" on both parents. As a consequence, the Court finds that respondent's actions are "in breach of rights of custody attributed to [petitioner] under the law of the State in which the child[ren] [were] habitually resident immediately before the . . . retention," namely, the United Kingdom. Hague Convention, art. 3(a).

Further, the English Child Abduction Act 1984 ("Abduction Act") provides that it is a criminal offense for a parent to take a child out of the United Kingdom for more than one month without the consent of the other parent, absent a court order in favor of the first parent. See

---

of the Children Act enumerates four types of orders that an English court may issue to restrict parental responsibility: (a) a "residence order," settling the arrangements for the person with whom a child will live; (b) a "contact order," requiring the person with whom the child lives to allow the child to visit or otherwise have contact with someone else; (c) a "prohibited steps order," prohibiting a parent from taking a specified action without the consent of the court; and (d) a "specific issue order," resolving a specific question that arises in connection with an aspect of parental responsibility.

Abduction Act, ch. 37, § 1. In other words, English law vests each parent of a child with a "*ne exeat* right: the authority to consent before the other parent may take the child to another country." Abbott, 2010 WL 1946730, at *3. More to the point, the Supreme Court has recently held that a "*ne exeat* right is a right of custody under the [Hague] Convention," reasoning that a parent's "joint right to decide [a child's] country of residence allows [the parent] to 'determine the child's place of residence' . . . . [and] also gives [the parent] 'rights relating to the care of the person of the child.'" Id. at *6-*7 (quoting Hague Convention, art. 5).

Petitioner testified that she sought and obtained the Prohibited Steps Order in 2006 specifically because she wanted to prevent respondent from taking or keeping the boys out of England without her consent. In addition to its bold-faced warning that "[i]t may be a criminal offense under the Child Abduction Act 1984 to remove the children from the United Kingdom without the leave of the Court," the Prohibited Steps Order stated, in its first provision, that "[u]ntil further order, [petitioner] and respondent are prohibited from removing the children from England and Wales." (PTX 25). This provision was continued by the Contact Order, which also contains a stipulation permitting "contact as may be agreed by the parties." (PTX 26). Thus, petitioner also holds a *ne exeat* right pursuant to both operation of English law and specific court order. Since August 25, 2008, respondent has breached this "right of custody" by retaining the children outside of England both without petitioner's consent and without ever seeking or obtaining authorization from the appropriate English court.[15]

---

[15] Respondent contends that petitioner herself "removed" the children from England in violation of the Prohibited Steps Order and Contact Order when she agreed to release the children to visit him in the United States for one month in summer 2008. Respondent's argument on this point neglects to mention, rather conveniently, the Contact Order provision permitting visitation "as may be agreed" by the parents. In any event, the merit, if any, of respondent's conclusory allegation is a matter of English law which is completely irrelevant to the instant Hague Convention inquiry, and therefore this Court will not address it. The proper question for this Court to decide is whether respondent has breached petitioner's rights of custody under English law, not vice versa. To the extent that respondent seeks to claim that a violation of his own English rights of custody has occurred, he is advised to direct his prayer for relief to a court of competent jurisdiction in England.

### 3. Custody Rights Exercised at Time of Retention

The third and final element of the *prima facie* case that petitioner must establish is that, at the time of the boys' retention in the United States by respondent , she was actually exercising her "rights of custody," or would have been exercising such rights but for the retention. See Hague Convention, art. 3(b).

Prior to trial, the parties stipulated that: "[d]uring the time when the Children lived with Petitioner in England, Petitioner took care of their overall well-being, providing them with clothes, food, shelter, medical and other living expenses." (JPTO § IV at ¶ 15). This was borne out by petitioner's testimony. (Tr. 35:6-22). Since July 25, 2008, A.H. and S.H. have been situated an ocean away from petitioner in the United States, a country that she is legally barred from entering; petitioner obviously has not been taking "care of their overall well-being" during this time. Notwithstanding, the Court finds it reasonable to conclude that, but for respondent's unilateral retention of the children in the United States past the scheduled end of their month-long visit, petitioner would have resumed taking "care of their overall well-being" in England. Similarly, the Court finds that petitioner would have exercised her *ne exeat* right but for the retention; she declined to consent to the boys' staying out of England for longer than one month, but she had no way to enforce that condition once they were physically present in the United States. See Abbott, 2010 WL 1946730, at *7.

In sum, petitioner has satisfied her burden of establishing a *prima facie* case of wrongful retention under the Convention.

### C. Age and Maturity Defense

"Children who are wrongfully removed or retained within the meaning of the Convention are to be promptly returned unless one of the narrow exceptions set forth in the Convention

29

applies." 42 U.S.C. § 11601(a)(4). Respondent's defense to petitioner's *prima facie* case for return is premised exclusively on an unnumbered sentence in article 13 of the Convention often dubbed the "age and maturity defense" or the "mature child exception," which provides that a court "may . . . refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views."[16] Hague Convention, art. 13. Respondent bears the burden of proving the applicability of the age and maturity defense by a preponderance of the evidence. See 42 U.S.C. § 11603(e)(2)(B).

The fact that a sufficiently mature child objects to repatriation "may be conclusive"; in other words, a district court can decline to order return of a wrongfully retained or removed child on that ground alone. Blondin II, 238 F.3d at 166. However, it bears emphasis that the Convention merely calls for a court to "take account of" a mature child's objection to return, not to accede to it automatically. Further, a court always retains discretion to order repatriation notwithstanding the applicability of any Hague Convention exception if that would best fulfill the purposes of the Convention; the discretionary aspect is particularly important with respect to the mature child exception "because of the potential for undue influence by the person who allegedly wrongfully retained the child." Hazbun Escaf, 200 F. Supp. 2d at 615. Such undue *influence* is not always calculated or intended by the custodial parent. "A lengthy wrongful retention could enable the child to become comfortable in his or her new surroundings, which may create a desire to remain in his or her new home." Tsai-Yi Yang v. Fu-Chiang Tsui, 499

---

[16] Aside from the "mature child exception," there are four affirmative defenses enumerated in the Convention, none of which respondent has invoked: (1) the petition was filed more than a year after the child was wrongfully removed and "the child is now settled in its new environment," Hague Convention, art. 12; (2) the petitioner "was not actually exercising the custody rights at the time of removal or retention, or had consented to or subsequently acquiesced in the removal or retention," id., art. 13(a); (3) "there is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation," id., art. 13(b); and (4) the return of the child "would not be permitted by the fundamental principles . . . relating to the protection of human rights and fundamental freedoms." Id., art. 20.

F.3d 259, 280 (3rd Cir. 2007) (finding that "[e]ven if the record supported a finding that [respondent] met his burden of proving the applicability of the exception to this case, it cannot be said that the District Court abused its discretion by refusing to apply the exception," because that "would reward [respondent] for violating [petitioner's] custody rights, and defeat the purposes of the Convention"). However, a finding of undue influence is not a prerequisite to a decision not to apply the mature child exception. See id. at 279 n.2 ("[T]he record is sufficient to support the District Court's determination that [the child] was not sufficiently mature for a court to appropriately consider her views and that the application of the exception in this case would frustrate the purposes of the Convention, absent a determination of undue influence.").

"Whether a child is mature enough to have its views considered is a factual finding" that a district court must make in light of the specific circumstances of each case. Simcox v. Simcox, 511 F.3d 594, 603 (6th Cir. 2007). "Given the fact-intensive and idiosyncratic nature of the inquiry, decisions applying the age and maturity exception are understandably disparate." De Silva v. Pitts, 481 F.3d 1279, 1287 (10th Cir. 2007) (comparing Anderson v. Acree, 250 F. Supp. 2d 876, 883 (S.D. Ohio 2002) (considering views of an eight-year-old child who was composed, calmly and readily answered questions, pointed to New Zealand on a globe, and indicated her understanding of the difference between truth and falsehood and of her obligation to tell the truth) and Raijmakers-Eghaghe v. Haro, 131 F. Supp. 2d 953, 957-58 (E.D. Mich. 2001) (ordering limited discovery including psychological reports and *in camera* interview to gather enough information to pursue issue of eight-year-old child's wishes) with Tahan v. Duquette, 259 N.J. Super. 328, 335, 613 A.2d 486, 490 (1992) (holding, without discussion, that the exception "simply does not apply to a nine-year-old child") and England v. England, 234 F.3d 268, 272-73 (5th Cir. 2000) (reversing district court that had taken a 13-year-old child's wishes

into account where child had learning disabilities, had had four mothers in twelve years, had attention deficit disorder, took Ritalin, and was scared and confused)).

The authors of the Hague Convention chose not to set a minimum age at which a child may be deemed sufficiently mature for a court to consider his objections to repatriation, and the Second Circuit has followed suit. See Blondin II, 238 F.3d at 166 (declining to conclude that "under the Convention, as a matter of law, an eight-year-old is too young for her views to be taken into account . . . . as this would read into the Convention an age limit that its own framers were unwilling to articulate as a general rule") (citing Pérez-Vera Report, supra, at 433, ¶ 30 (stating that, "all efforts to agree on a minimum age . . . failed" and "it seemed best to leave the application of this clause to the discretion of the competent authorities," but "the fact must be acknowledged that it would be very difficult to accept that a child of, for example, fifteen years of age, should be returned against its will.")).

Simply put, there are no established objective criteria or tests for assessing "maturity" in the context of the mature child exception, see Anastacia M. Greene, Seen and Not Heard? Children's Objections Under the Hague Convention on International Child Abduction, 13 U. Miami Int'l & Comp. L. Rev. 105, 132 (2005), although the Second Circuit has observed as a general matter that the standard should be a relatively demanding one. See Blondin II, 238 F.3d at 166 (holding that a court may consider any testimony of a child that is "germane" to a broader analysis of whether a grave risk of harm exists upon repatriation, and noting "it stands to reason that the standard for considering a child's testimony as one part of a broader analysis . . . would not be as strict as the standard for relying solely on a child's objections to deny repatriation under Article 13"). While the testimony of psychological experts is frequently proffered in this context, "[f]ew cases address the weight to be accorded to a psychologist's testimony in a Hague

Convention case." Morrison v. Dietz, No. 07-cv-1398, 2008 WL 4280030, at *12 (W.D. La. Sept. 17, 2008). See generally Greene, Seen and Not Heard?, supra, at 132 (collecting cases). A handful of courts have rejected such testimony wholesale, finding it to be "appropriate in a custody proceeding, not in a Hague Convention case." Morrison, 2008 WL 4280030, at *12 (declining to accept psychologist's testimony in determining whether either the grave risk of harm or mature child exceptions applied); see, e.g., Tahan, 259 N.J. Super. 328, 334, 613 A.2d 486, 489 ("Psychological profiles, detailed evaluations of parental fitness, evidence concerning lifestyle and the nature and quality of relationships all bear upon the ultimate issue [of custody]. The Convention reserves these considerations to the appropriate tribunal in the place of habitual residence."). Others, however, have relied heavily on psychologists' testimony when deciding whether to apply the mature child exception. See, e.g., Garcia v. Angarita, 440 F. Supp. 2d 1364, 1381 (S.D. Fla. 2006) ("[Although the child] is an impressive, well-mannered and articulate eleven-year old, the undersigned credits the opinion of [psychologist] Dr. Firpi that, based upon the circumstances of this case . . . , he is not of sufficient age and maturity such that the court should refuse to order his return based on his objection.").

Significantly, courts distinguish between a child's "objection" to return, as referenced in the Hague Convention, "and a child's wishes, as expressed in a custody case . . . . [T]he notion of 'objections' . . . is far stronger and more restrictive than that of 'wishes' in a custody case." Morrison, 2008 WL 4280030, at *13 (internal quotation marks omitted). A child's expression of a preference to remain in the United States rather than a particularized objection to repatriation may provide a basis for a court to find the mature child exception inapplicable. See, e.g., Falk v. Sinclair, -- F. Supp. 2d --, No. 09-cv-346, 2010 WL 723744, at *16 (D. Me. Mar. 19, 2010) ("[The child] made clear to me that, despite her strong negative feelings about her German

33

school and a preference to remain in Maine, she does <u>not</u> object to being returned to Germany. Expression of a <u>preference</u> to remain in the respondent's country 'is not enough . . . to disregard the narrowness of the age and maturity exception to the Convention's rule of mandatory return.'") (quoting <u>Yang</u>, 499 F.3d at 279); <u>Trudrung v. Trudrung</u>, No. 10-cv-73, 2010 WL 675064, at *6-*7 (M.D.N.C. Feb. 10, 2010) (finding 15-year old sufficiently old and mature for his opinion to be considered, but ordering return because he had merely testified that his preference was to remain in the United States while expressing no strong objection to returning to Germany, and because his decision was "likely influenced at least in part by his custodial presence with his mother" and "reflect[ed] the product of limited analysis"); <u>Locicero v. Lurashi</u>, 321 F. Supp. 2d 295, 298 (D.P.R. 2004) ("The fact that the [13 year-old] child prefers to remain in Puerto Rico, because he has good grades, has friends and enjoys sports activities and outings, is not enough for this Court to disregard the narrowness of the age and maturity exception to the Convention's rule of mandatory return."). <u>But see</u> <u>De Silva</u>, 481 F.3d at 1287 (affirming district court decision to apply the age and maturity defense and refuse repatriation where 13-year old had stated that he had made friends in the United States, described his house as "really big" and "a great place" where he has a computer and everything he needs for school and indicated that he thought the school was better here). Like the determination of "maturity," a finding that a child does not truly "object" to being returned to his country of habitual residence, particularly when based in part on a district court's first-hand observation of the child, "is of the sort peculiarly within the province of the trier of fact." <u>Blondin II</u>, 238 F.3d at 167.

The Court easily finds that respondent has not proved by a preponderance of the evidence that S.H., who was interviewed *in camera* approximately two months shy of his tenth birthday, is

sufficiently mature for the Court to take his views into account.[17] As noted above, S.H. expressed a strong – indeed, unequivocal – desire to remain in New York rather than return to England. His main objections to England itself appear to be his aversion to the climate (which is always rainy and cold, and never summer) and his staunch belief that England offers inferior athletic opportunities (because the sport of cricket is never played there) and educational opportunities (because there are no science, social studies or gym classes taught in English schools). Primarily, however, S.H. explained his objection to return by drawing an intensely unfavorable comparison between what life is like now with his father and what he now recalls life was like before with his mother, who he last saw when he was eight years old. Despite the fact that, as the Court finds, respondent did not intentionally plant words in S.H.'s mouth, the child's view of his mother has clearly been impacted by his physical separation from her for much of his life and the strained and often bitter relationship between his parents.

The Court was obviously concerned by S.H.'s sweeping statements regarding the mistreatment of the children by their mother. However, S.H. is the only witness in this case who has made such extreme allegations. The older child talked about a few specific instances when his mother had hit them or left them alone for a short period of time, but he did not describe an ongoing pattern or practice. Further, respondent has never claimed that petitioner physically abused the children, and has not asserted that the "grave risk of harm" exception to the Hague

---

[17] The Court has given no weight to Dr. Skoler's testimony and report in assessing either child's maturity level, or in determining any other matter in controversy. Dr. Skoler's opinions regarding the potentially distorting effects of the protracted custody battle, parental alienation and ping-pong lifestyle that A.H. and S.H. have experienced, as well as their notable verbal abilities and overall intelligence, essentially confirmed the obvious. Further, his dismissal of their responses to test and interview questions as overly "guarded" – i.e., not to be believed – merely veered into credibility-assessment territory. In any event, the credibility and weight of testimony are questions to be decided exclusively by the Court. "[W]itnesses may not opine as to the credibility of the testimony of other witnesses at the trial." United States v. Scop, 846 F.2d 135, 142 (2d Cir. 1988); see Chacko v. DynAir Svcs., Inc., 272 Fed.Appx. 111, 112 (2d Cir. 2008) ("The decisions as to whose testimony to credit and which of permissible inferences to draw are solely within the province of the trier of fact."). Frankly, short of opining as to a mental or emotional pathology, it is hard to fathom what a psychologist in a Hague Convention case could opine that is not already within the ken of an ordinary finder of fact.

Convention should apply to prevent repatriation. While the Court does not find that S.H. was intentionally untruthful, the only reasonable conclusion for the Court to draw is that some of S.H.'s experiences as a young child are distorted and inflated in his memory. This is borne out by the fact that S.H. made other statements about his mother's behavior that he could not possibly have known first-hand, e.g., that she never spent any money on S.H. or his brother.

All in all, the Court finds that S.H. is an intelligent, well-mannered and congenial child, but hardly sufficiently mature for the Court to take his views into account in deciding whether or not to order return to his country of habitual residence. He "ha[s] reasons to support [his] preference to remain in the United States, but such reasons [are] not necessarily sufficient to invoke the [mature child] exception." Yang, 499 F.3d at 279 (affirming district court's determination that exception should not apply to prevent return of 10-year old "borderline genius" because she did not raise "particularized objections to returning to Canada, but . . . possessed a more generalized desire to remain in Pittsburgh similar to that of any 10-year old having to move to a new location."). Cf. Castillo v. Castillo, 597 F. Supp. 2d 432, 441 (D. Del. 2009) (The "child expressed particularized objections to returning to Colombia, pointing out that, in Colombia, she received little help with homework, performed poorly in school (at least relative to her performance in the United States), was often unable to play outside due to safety concerns, spent much of her time at home alone, and had few friends. These particularized objections evidence to the court that child's desire to remain in the United States is born of rational comparison between her life here and her life in Colombia. The court considers a desire based on such rational comparison to be a mature desire worth taking into account."). S.H. sees this as a choice of which parent he wants to live with, not which country he wants to grow up in; his stated preference to remain in New York is not a particularized, mature objection that should

be part of the Court's Hague Convention analysis. Cf. Ago v. Odu, No. 8:09-cv-976, 2009 WL 2169857, at *14 (M.D. Fla. July 20, 2009) (applying mature child exception when "[a]s [the 14-year old child] sees it, life is better here and he is more comfortable in his surroundings. This is not a choice of parents but as he sees it a choice of country"); Mendez Lynch v. Mendez Lynch, 220 F. Supp. 2d 1347, 1362 (M.D. Fla. 2002) ("The Court finds that at age nine, in light of the undisputed testimony, Dylan has attained an age and degree of maturity sufficient to take his opinion into account . . . . Dylan loves and wants to see his father, but in Florida. Dylan's concerns are with the country of Argentina, not with his father.").

It is, to be sure, a much closer question whether A.H. has attained sufficient age and maturity for the Court to take his views into account. The Court found him to be a remarkably intelligent, well-spoken and mature 12-year old – but he is still only 12. And, as is hardly surprising given that A.H. has been the subject of an international tug-of-war since age four, his *in camera* testimony revealed that he harbors conflicting emotions about his family that deeply affect his worldview.

More critically, even to the extent that it is appropriate to take A.H.'s views into account, they do not foreclose his return to England. A.H., like his little brother, bemoaned the weather and the availability of interesting sports activity in England and ticked off a laundry list of reasons why he likes living with his father more than his mother. However, the message that A.H. conveyed most coherently and emphatically is that, above all, he does not want to be separated from S.H. Indeed, A.H. openly admitted that he definitively decided that he did not want to return to England once S.H. informed him that he wanted to stay in New York. A.H. told the Court: "I don't want to be split from my brother. I said that's what I think too. That is what I thought too." (Tr. 354:2-5). And, although S.H. testified cavalierly that his preference to

stay in New York has nothing to do with where his older brother ends up, the Court found this bravado to be belied by S.H.'s repeated use of collective terms to explain his thoughts and actions: "We made it like when it was summer, like we enjoyed the time there. We said we wanted to stay with dad in New York . . . that's when we made our decision." (Tr. 388:5-8).

The Court finds A.H.'s commitment to staying with his brother to be the most compelling testament possible to A.H.'s maturity. These two children have long been the only constant presence in one another's lives, and they operate as a team. A.H. indicated that he comprehends this reality, and made his position very clear to the Court: although he has expressed a preference to remain in the United States now, this preference will evaporate if S.H. returns to England. A.H., in other words, has expressed a sincere preference to remain in the United States, but certainly not an unequivocal objection to his return to the United Kingdom. Thus, A.H.'s viewpoint, as mature as it is, cannot be an adequate basis for this Court to "disregard the narrowness of the age and maturity exception to the Convention's rule of mandatory return." Yang, 499 F.3d at 279.

For the foregoing reasons, the Court finds that respondent has not shown that any exception to mandatory return pursuant to the Hague Convention applies in this case. Accordingly, S.H. and A.H. must be returned to England.

## EXPENSES OF PROCEEDING

Pursuant to Article 26 of the Hague Convention and 42 U.S.C. § 11607(b)(3), any court that orders the return of a child under the Convention "shall order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees, foster home or other care during the course of proceedings in the action, and transportation costs related to the return of the child, unless the respondent establishes that such order would be

clearly inappropriate." 42 U.S.C. § 11607(b)(3). Respondent has not claimed or established that such an order would be "clearly inappropriate." Further, the fact that the petitioner in this case was represented by *pro bono* counsel does not provide a basis for disregarding the Convention's fee provision. See, e.g., Wasniewski v. Grzelak-Johannsen, 549 F. Supp. 2d 965, 970-71 (N.D. Ohio 2008); Antunez-Fernandes v. Connors-Fernandes, 259 F. Supp. 2d 800, 816-17 (N.D. Iowa 2003).

## CONCLUSION

Accordingly, petitioner is directed to file, on or before June 21, 2010, a proposed judgment with an itemized bill of fees and costs. In preparing its fee application, petitioner's counsel is asked to recall its commitment to be "mindful of both the fact[s] that the primary reason for [counsel] accepting this engagement was to provide a public service, and that, upon information and belief, [r]espondent does not have vast resources." (Petitioner's Post-Trial Mem. at 25). On or before June 28, 2010, respondent may file any objection or exception along with sworn documentary proof establishing, based on respondent's financial position or otherwise, that ordering payment of such claimed expenses would be "clearly inappropriate." Any reply by petitioner must be filed on or before July 6, 2010. Any request for a fact hearing as to any of these matters must be filed on or before June 30, 2010.

**SO ORDERED.**

DATED:     Brooklyn, New York
           June 8, 2010

                                        _____
                                        ERIC N. VITALIANO
                                        United States District Judge

39